


Attorney at Law & Associates, P.C.

The Empire State Building
350 Fifth Ave., Suite 4020
New York, NY 10118
212.564.2440
www.petruslaw.com

September 4, 2019

The Honorable George B. Daniels
United States Courthouse
500 Pearl St., Courtroom 11A
New York, NY 10007-1312

**Re: USA v. Evaldas Rimasauskas, Case # 16 CR 841 (GBD)**
**Sentencing Memorandum to be Filed Under Seal**

Dear Judge Daniels:

Evaldas Rimasauskas ("the Defendant"), through counsel, files this Memorandum in anticipation of his Sentencing on September 25th, 2019 at 10:00 am.

### **SENTENCING GUIDELINES**

Rimasauskas recognizes that the Guidelines are not binding upon the Court. However, the version of the United States Sentencing Guidelines effective November 1, 2018, applies to this matter.

The applicable guideline is U.S.S.G. §2B1.1, which provides a base offense level of 7, as Count One has a statutory maximum term of imprisonment of 20 years or more. U.S.S.G. §2B1.1(b)(1)(M) also applies because the intended loss was greater than $65,000,000, but less than $150,000,000. This results in an increase of 24 levels.



*Paul D. Petrus Jr.*
Attorney at Law & Associates, P.C.

U.S.S.G. §2B1.1(b)(1) applies because a substantial part of the fraudulent scheme was committed outside the United States, the offense otherwise involved sophisticated means, and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. This results in an increase of 2 levels.

As of the date of this letter, Rimasauskas has demonstrated a recognition of and acceptance for personal responsibility the offense charged. Therefore, a downward adjustment of two levels is appropriate if the acceptance of responsibility continues through the date of sentencing. *See* U.S.S.G. § 3E1.1(a).



Therefore, the applicable Guidelines offense level is 30.

The Parties have agreed that either may seek a sentence outside the stipulated Guidelines range based upon factors to be considered in imposing a sentence pursuant to 18 U.S.C. 3553(a)(PSR, p. 5(k)).

## FACTUAL BACKGROUND

Rimasauskas is 51 years old and from Vilnius, Lithuania. Prior to his arrest, he lived with his wife, who, as a result of the arrest, must reside with her father in Minsk, Belarus. Rimasauskas grew up in a middle-class family, and is still close with his mother (age 72) and sister (age 45). His father, who struggled with a drinking problem most of his life, passed away from lung cancer in 2008 at the age of 65. After graduating from a four-year technical high school and serving in the Lithuanian Army, Rimasauskas attended Vilniau Gedimo Technikos Universitetas in Vilnius from 1989 to 1995, where he received a university degree.

No one else in the Rimasauskas immediate family has ever been arrested, with his instant arrest serving as a "huge shock" to his mother and sister. He speaks with them



*Paul D. Petrus Jr.*
Attorney at Law & Associates, P.C.

both weekly, remarking that the situation has been difficult for his mother because of what has been said about him in the newspapers. Lithuania is a small country and his mother has to deal with everyone asking a lot of questions.

Rimasauskas was arrested on March 14, 2017, in Lithuania, extradited to the United States on August 17, 2017, and never afforded bail.

## WORK

From 2012 on, Rimasauskas was the 50 percent owner of UAB Ksaks, a construction company in Lithuania. Alongside his business partner, Rimasauskas employed between one and ten people (depending on how busy the company was; his income varied between $2,237 to $3,355 monthly). However, his business struggled and the company is now "frozen." At times, he earned nothing at all, and his unstable business was one of the reasons why he drank heavily. (*See* "BNM Finance" Document).

## SUBSTANCE ABUSE

One of the Rimasauskas' most prominent health conditions is substance abuse. He began drinking at the age of fourteen. In the last ten years, his drinking has become problematic, drinking daily and easily consuming a half liter of alcohol throughout the day. He would drink enough to get intoxicated, but would "try" not to drink if he was working.

In order to stop his drinking, Rimasauskas sought help on his own by seeking out a psychologist. He met with the doctor one or twice a week for roughly three months, until the doctor reportedly died of cancer. He claims that his time in treatment was helpful and he drank less during this period of treatment.

## PHYSICAL HEALTH HISTORY

Rimasauskas is afflicted with several physical health problems. They include severe lower back pain from osteochondrosis, asthma, sleep apnea and an inguinal hernia, which resulted in a surgery and a four-day hospital stay. In August of 2018, Rimasauskas began complaining about his sleeping conditions while incarcerated in Manhattan Detention Complex. Our office called Manhattan Detention Complex to speak with



*Paul D. Petrus Jr.*
Attorney at Law & Associates, P.C.

Clodina Bobson in reference to Rimasauskas' sleep study program. However, pursuant to conversation with the staff, they advised the office that they were unable to share the direct number of Clodina Bobson, and instead our office was transferred to the voicemail of an unidentified staff member where we left a voice message expressing our concerns. In January of 2019, Rimasauskas was having trouble with his sleep issues and requested a bottom bunk pass from Manhattan Detention Complex.

## A SENTENCE SIGNIFICANTLY OUTSIDE THE GUIDELINES RANGE IS APPROPRIATE

Under the factors set forth in 18 U.S.C. §3553(a), the Defendant respectfully requests that the Court impose a sentence outside of the Stipulated Guidelines range of 97 to 121 months of incarceration. 18 U.S.C. §3553(a) directs the Court to "impose a sentence sufficient, but not greater, than necessary," based on the statutory objectives and relevant factors. The analysis below strongly supports imposing the mandatory minimum prison sentence.

For the following reasons, Rimasauskas respectfully requests that he be sentenced to Time Served.

[redacted]



*Paul D. Petrus Jr.*
Attorney at Law & Associates, P.C.

[content redacted]



*Paul D. Petrus Jr.*
Attorney at Law & Associates, P.C.

## II. THE DEFENDANT'S ROLE IN THE CONSPIRACY WARRANTS A LESSER SENTENCE TO DISTINGUISH HIM FROM THOSE WITH GREATER ROLES

In *U.S. v. Ruiz*, a downward departure was granted for the defendant on the grounds that he was a minor participant in the alleged crime, as there was no evidence that he was a longstanding member of the conspiracy with a regular role, but was recruited specifically for the purpose of accepting a particular shipment of drugs. *United States v. Ruiz*, 246 F. Supp. 2d 263, 271 (S.D.N.Y. 2002).

In *United States v. Fernandez*, the defendant received a downward departure where the court determined his role as "essentially fungible" with respect to the importance of his actions to the success of the venture. He was as deemed a minor participant because he was "less culpable than most participants, but his role couldn't be described at minimal." *United States v Fernandez*, 312 F. Supp 2d 522, 524 (SDNY 2004). *See, also, United States v Ruiz, supra,* 246 F Supp 2d at 272 (granting a downward departure in sentencing because the defendant was not critical to the success of the enterprise, "except in the trivial sense in which every cog in the machine has to play its part in order for the machine to work"; "virtually anyone could have been inserted to accept delivery without threatening the success of the enterprise.); *United States v. Sanchez,* 925 F. Supp. 1004, 1013 (S.D.N.Y. 1996)(defendant was granted a downward departure on the grounds that he was a minor participant due to his noncritical role in the success of the venture as the drugs he bought could have been solder to any number of buyers, thus making his role "surely replaceable").

Here, Rimasauskas was not "critical to the success of the enterprise." *Ruiz*, 246 F. Supp. 2d at 272. Similar to *United States v Ruiz*, where "virtually anyone could have been inserted" to perform the defendant's actions without threatening the success of the enterprise--anyone could have fulfilled this role of opening a bank account and providing signatures and lying. *Id.* As he stated in his plea, he was not the creator of the documents presented to the banks (Plea Allocution, p. 14). Similar to *United States v. Sanchez*, he played the minor, "replaceable" role of providing his signature for the bank accounts and related acts that could have essentially been performed by any other person (*See* Plea Allocution, 14). As acknowledged during the plea allocution by AUSA Choi, Rimasauskas was not the actor who induced the victims to make the initial transfers.

6

*Paul D. Petrus Jr.*
Attorney at Law & Associates, P.C.



### III. THE COURT SHOULD SENTENCE OUTSIDE THE GUIDELINES RANGE WHERE THE DEFENDANT'S HISTORY IS ONE OF EMPLOYMENT AND LACK OF CRIMINALITY

On this March 20, 2019, Rimasauskas pled guilty and allocated to the Court:

THE DEFENDANT: From October 13 until October, approximately 2016 – I'm sorry, '15 – I was involved in a fraudulent scheme with wire money transfers. And these transfers were coming from two fraudulent companies into bank accounts, which belonged to Quanta Computer Company which were located in Latvia and in Cyprus. I participated in that fraudulent scheme by pretending and introducing myself as director of that company.

Also, I applied my signature to bank accounts into which money was wired from Internet companies who were the victims of this fraudulent scheme. I also signed fraudulent contracts and documents which were made by other individuals and presented them to banks so that I could receive fraudulent bank money transfers, and those were wired into the fraudulent bank accounts opened by Quanta Computer Company.

These bank accounts were used to receive money wired by fraudulent means, and in particular these transfers were wired through New York. And I fully understood that my actions were fraudulent.

Thank you.

THE COURT: And why did these victims transfer this money? What were they promised?

(Defense counsel and the defendant conferred)

MR. PETRUS: Your honor, he's ready to answer the question that the Court put to him.

THE COURT: Yes, sir.



*Paul D. Petrus Jr.*
Attorney at Law & Associates, P.C.

THE DEFENDANT: Can you please repeat the question?

THE COURT: Yes. Why did the victims transfer this money? What were they promised?

THE DEFENDANT: I am not sure a hundred percent, because I was asked to open bank accounts and after that I did not do anything with these accounts.

THE COURT: So in what way did you know this activity was fraudulent?

THE DEFENDANT: Well, these were large amounts of money transferred to a new company.

MS. CHOI: Your Honor, may I proffer some facts that may solve this confusion.

THE COURT: Yes.

MS. CHOI: As means of background, I think there may have been – for clarity of the record I just want to make sure this is clear it is the government's understanding that there were fraudulent transfers that were made into back accounts that were opened by the defendant. They were opened in the name of Quanta Computer, which is in fact a real hardware company, but he had nothing do with the real hardware company. He opened these bank accounts. One victim company sent a series of wires to the first of those bank accounts, and in furtherance of the scheme this defendant submitted, for instance, false contracts to support the transfers, letters that were falsified saying that they were legitimate transfers from a bank and other documents to try to support the fraud. It is not the government's understanding that he induced the victims to make the initial transfers, but he created the infrastructure to further the fraudulent transfers.

MR. PETRUS: I would just add that he created it in part. I think some of the confusion might have been when the translation said that he received the funds, but that is not correct. It was that the funds went to the bank account that he helped open up.



**Paul D. Petrus Jr.**
Attorney at Law & Associates, P.C.

THE COURT: That bank account was ostensibly for a company that he was not associated with or was not actually doing the business it was held out to be doing?

MR. PETRUS: Yes, your Honor.

THE COURT: All right.

(*See* Exhibit A, [*Plea Allocution, TR. 15:24-16:1-8*]).

In *U.S. v. Jagmohan*, the defendant's "utter lack of sophistication" in using a personal check bribery transaction, juxtaposed to the sophistication typically shown by persons bribing an official, warranted a downward departure from 15 to 21 months to probation and a fine. 909 F.2d 61 (2d Cir. 1990). The court acknowledged the defendant's "entirely stable background, indicated by his employment history" and how his "unusually unsurreptitious conduct in undertaking the bribery constituted a mitigating factor 'of a kind, or to a degree' not adequately considered by the Guidelines." 909 F.2d at 65. *See, also, United States v. Ritchey*, 949 F.2d 61, 63 (2d Cir. 1991) (single, aberrant act); *U.S. v. Skinner*, 946 F.2d 176, 179-80 (2d Cir. 1991)(atypical conduct).

Similar to *Jagmohan*, the Defendant had an entirely stable background prior to this incident, as shown in his employment history and lack of criminal history (*See* Presentencing Investigation Report, pg 10, sect. 52). Friends and family members have written letters to demonstrate Rimasauskas's character. His wife, Olga, describes the Defendant as "a faithful and severe friend," who "sincerely and selflessly helps those in need," recounting times when he helped his employees when he "paid for their medicine and doctor appointments when they didn't have enough money." (*See* Exhibit B, [*Fifteen (15) Letters of Support on Behalf of Rimasauskas*]). Dmitry Piasetsky, the Defendant's friend, and a representative of the "Youth Sports Public Organization Sport Club Patriot," discussed the Defendant's efforts to give back to his community, "And, although Evaldas is directly far from the sport, he's still close to use – he has always supported me, my athletes, helped us in competitions, participated in the life of the club, talked to and has been friends with my students" (*See* Exhibit B).

Case 1:16-cr-00841-GBD Document 40 Filed 09/04/19 Page 10 of 11



**Paul D. Petrus Jr.**
Attorney at Law & Associates, P.C.

In 1995 case, the Second Circuit described the role of minimal participation in a crime thus:

The commentary to Section 3B1.2(a) of the Guidelines states that "defendants who are plainly among the lease culpable of those involved in the conduct of a group" are minimal participants. U.S.S.G. 3B1.2(a) comment. Under this section, "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." *Id* . . . .

*U.S. v. Gaston*, 68 F.3d 1466, 1467 (2d Cir. 1995). *See, e.g., United States v. Restrepo*, 936 F.2d 661, 667 (2d Cir. 1991) (minimal role).

Rimasauskas' only departure from his stable history has been his role in this crime; a role which was not only easily replaceable, but also lacks sophistication due to his simplistic role. His role was limited to introducing himself as a director of the companies, opening a bank account, and using his signature for the account and for other documents. (See Plea Allocution, 14). This role lacks sophistication, as ultimately, he signed documents and assisted with the clerical tasks of the crime and otherwise acted as a functionary in this matter.

IV. **RIMASAUSKAS SHOULD BE GIVEN CREDIT FOR TIME SERVED FOR THE TIME HE WAS DETAINED IN LITHUANIA**

18 U.S.C.A. §4105 provides, *inter alia*, that an offender serving a sentence of imprisonment in a foreign country who is transferred to the custody of the Attorney General shall be given credit toward serve of the sentence for any days, prior to the date of commencement of the sentence, spent in custody in connection with the offense or acts for which the sentence was imposed.

Here, Rimasauskas was arrested and jailed in Lithuania since March 14, 2017, and not transferred to this Country until August 17, 2017, five (5) months later. He was never afforded bail and hence detained during that entire period. Rimasauskas should accordingly be afforded credit for time served.

10



*Paul D. Petrus Jr.*

Attorney at Law & Associates, P.C.

## V.   RIMASAUSKAS' SENTENCE SHOULD BE TIME SERVED

Count One of the Indictment charges that, from 2013 to 2015, Rimasauskas perpetrated a scheme of using fraudulent emails to trick victim companies into writing millions of dollars intended for Company-1 to bank accounts controlled by Rimasauskas for Company 2 and caused interstate and foreign email and wire transfers of funds through the Southern District of New York.  It charges him with a violation of 18 U.S.C. 1349, 1343, and 2.

Rimasauskas respectfully requests that he be sentenced to time served, which at this time stands at approximately two and a half (2.5) years of incarceration in total. Here, he has pled guilty to Count I of the Indictment, ▇▇▇▇▇▇▇▇▇▇▇▇, and has little if any risk of future criminal activity.  The companies determined to be victims in this matter either recouped all of their losses, or chose not to submit victim impact statements.  In addition, the time he has served is more severe than the average inmate's as he is in a foreign country, does not speak the same language, speaks a language that few, if any inmates he contacts understands, and is far removed from anyone he knows as he is from Lithuania.

## CONCLUSION

For the reasons set forth above, Rimasauskas requests that the Southern District of New York impose a sentence outside of the Stipulated Guidelines Range and sentence him to Time Served.

Yours,

*[signature]*

Paul D. Petrus Jr. & Associates P.C.
Law Office for Evaldas Rimasauskas
The Empire State Building
350 Fifth Avenue, Suite 4020
New York, NY 10118
Tel: (212) 564-2440
Fax: (212) 967-3010
Email: paul@petruslaw.com