JB6EEVAC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              16 Cr. 841 (GBD)

EVALDAS RIMASAUSKAS,

          Defendant.          Conference

------------------------------x

                       New York, N.Y.
                       November 6, 2019
                       10:30 a.m.

Before:

             HON. GEORGE B. DANIELS,

                       District Judge

              APPEARANCES

GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York
EUN YOUNG CHOI
OLGA I. ZVEROVICH
    Assistant United States Attorney

PAUL D. PETRUS, JR.
    Attorney for Defendant

ALSO PRESENT:
JONATHAN POLONITZA, FBI

INTERPRETER, YANA AGOUREEV (Russian)

JB6EEVAC

```
 1                (Case called)

 2                MS. CHOI:  Good morning, your Honor.

 3           Eun Young Choi on behalf of the Government.

 4                With me at counsel table is Olga Zverovich and

 5      Jonathan Polonitza of the FBI.

 6                THE COURT:  Good morning.

 7                MR. PETRUS:  Good morning.  Paul Petrus on behalf of

 8      Mr. Rimasauskas.

 9                THE COURT:  Good morning.

10                Mr. Petrus, have you received a copy of the

11      presentence report and had an opportunity to review it with

12      your client?

13                MR. PETRUS:  I have, your Honor.

14                THE COURT:  Do you have any current objections or

15      corrections to be made to the Court at this time?

16                MR. PETRUS:  No, I do not.

17                THE COURT:  Let me first start with the Government.

18                Government, do you wish to be heard on sentence?

19                MS. CHOI:  Your Honor, I think we'll be brief.

20                The Government submitted a rather extensive sentencing

21      submission regarding this particular defendant.

22                As your Honor knows, he was a prolific money launderer

23      for an extended period of time engaged in very lucrative and

24      extensive fraud against two United States companies.

25                We note that, although the defendant asks for time
```

JB6EEVAC

1    served, both the Government and Probation believe that a

2    guideline sentence is necessary in this case and warranted

3    given the specific facts.

4            If I could just highlight, your Honor, very quickly

5    what those facts are, and to the extent your Honor has any

6    further questions, we'd be happy to answer them.

7            First, I think most importantly, this is an individual

8    who has specifically shown through his actions that he is not

9    easily deterred.

10           If you note from your knowledge of the case, and as

11   set forth in our sentencing submission, the scheme involving

12   the theft from the first company -- the first U.S. company --

13   through the use of a false, fake company that used the name of

14   a real company that did business with the victim company was

15   started by Mr. Rimasauskas.

16           He had to travel internationally to open a bank

17   account and submitted false documentation once questions arose

18   about the nature of the business.  He understood that that

19   business did not have an ongoing, legitimate business concern,

20   and that it was, in fact, fraudulent.

21           Lest there be any doubt, there was a fact-finding

22   investigation done by the Latvian law enforcement authorities

23   that led to a court decision.

24           During those proceedings, Mr. Rimasauskas made

25   numerous statements that were false to Latvian law enforcement

JB6EEVAC

1    as well as to the Court.  The Latvian courts, nevertheless,

2    found in an equivalent of our civil remedy, sort of contacts

3    and procedures, that the first victim company was, in fact, the

4    victim of a fraud involving Mr. Rimasauskas, and that the money

5    that was stolen, which was approximately $24 million, should be

6    returned to Victim One.

7            Nevertheless, despite that finding, Mr. Rimasauskas

8    continued in the scheme, this time traveling to Cyprus doing

9    exactly the same thing that he did the last time:  Opening a

10   new bank account, brazenly introducing the statements from the

11   first bank that he used in Latvia to show the degree and the

12   amount of transactions that had occurred with the kind of

13   priority victim company to establish that it would be

14   legitimate to assume, from the Cyprus bank's perspective, that

15   there would be multimillion dollar wires coming from other

16   technology companies, including Victim Two, in this case.

17           He had to fill out an application, which detailed that

18   he understood that there would be a scheme involving Victim

19   Two, since he put Victim One and Victim Two's names in the bank

20   documentation as counter parties, and then continued with the

21   scheme, including by submitting false documentation and

22   contracts that he signed, attempting to ensure that transfers

23   of money were made between the bank accounts he fraudulently

24   opened and other bank accounts so as to make it very difficult

25   for law enforcement or the victims to recoup those expenses.

JB6EEVAC

1      It is true, as the defendant knows, that much of the

2  money had now been reversed, but there's still $26 million

3  worth of loss that has not been recouped at this point, and

4  that is directly due to efforts made by Mr. Rimasauskas and

5  others that worked with him to quickly disburse the funds once

6  they were stolen from a victim company to a series of other

7  company bank accounts all over the world in furtherance of

8  their money laundering scheme.

9      In sum, your Honor, this is a defendant who was not

10  specifically deterred in a situation in which the fraud had

11  been found by a Latvian court.  He traveled internationally to

12  facilitate that scheme and submitted a slew of fake documents

13  to various banks and law enforcement authorities in order to

14  purportedly justify and make it appear as though there was a

15  legitimate business concern and a business, that he understood,

16  was not, in fact, legitimate and continued, essentially, until

17  he was caught by law enforcement.

18      I think in this case it's not a situation in which the

19  defendant should get time served.  We think it would be

20  inappropriate and that there is a general deterrent needed in

21  light of the prolific amount of business email compromised

22  schemes that happened.  For situations in which that

23  individuals such as the defendant is found to be guilty and

24  caught by law enforcement, there needs to be a message sent to

25  others that are similarly situated like him that they should

JB6EEVAC

1   not engage in this type of fraudulent behavior regardless of

2   where they might be in the world.

3          THE COURT:  Was there some attempt at cooperation in

4   this case?

5          MS. CHOI:  Your Honor, could we have a sidebar on that

6   question?

7          THE COURT:  All right.

8          Let me go past that for a second.

9          MS. CHOI:  OK.

10          THE COURT:  Can you tell me a little bit more about

11   the extent of the criminal activity, what your deputy discussed

12   with regard to others involved, other coconspirators?

13          MS. CHOI:  Your Honor, as to the scheme, we believe

14   there are other coconspirators involved.  I'm not going to

15   represent that Mr. Rimasauskas was number one at the apex among

16   them.  I would say that he did play a central role

17   nevertheless, and a repeating role throughout this period of

18   time, which was at least from 2013 to 2015.

19          His role was primarily as the money launderer of the

20   operation; meaning, he opened the bank accounts, he maintained

21   the bank accounts because his name was the only one as the

22   authorized signatory to allow for those transactions.

23          It may, in fact, be the case that there are other

24   people involved in directing where the funds should be; but

25   what we do know is he played a role in the opening of the bank

JB6EEVAC

accounts, maintaining the bank accounts, interfacing with the

banks when the banks had a question about the number and the --

the number of transactions and the volume of transactions at

issue in order to increase the transfer limits and to make

representations about the legitimacy of the wires that he knew

were, in fact, stolen funds.

So he was the money launderer of the operation.  We're

not alleging that he was the person who was behind the keyboard

who, in fact, sent the fishing emails that managed to trick

Victim One and Victim Two into this scheme; but nevertheless,

he understood that that was the part of the scheme, that there

would be a way in order to trick these victim companies into

transferring these large, millions of dollars of funds to a

fraudulent company that he maintained was his, and told people

was his -- including law enforcement -- and also represented he

was doing legitimate business when he knew, in fact, they

weren't.

THE COURT:  How would you characterize the extent of

his personal profit again?

MS. CHOI:  To our understanding, we don't have

evidence that he made the full loss amount.  Obviously, I think

that he was paid a relatively large sum, but it was not nearly

as much as the amount that was stolen from the companies.

THE COURT:  What do you mean by "relatively large

sum"?

JB6EEVAC

1          MS. CHOI:  Your Honor, I think it's in the range of a

2     hundred thousand dollars that he made for this.

3          THE COURT:  And no other arrests with regard to this

4     crime have been --

5          MS. CHOI:  None to date, your Honor.

6          THE COURT:  And were any funds recovered as opposed to

7     blocked?

8          MS. CHOI:  I can break this down.  There is Victim

9     One, which is approximately $24 million, and Victim Two, which

10    is almost a hundred million dollars.

11         With regard to Victim One, almost all of those funds

12    were returned after the Latvian court decision.  So they were

13    frozen in Latvia, for the most part, and returned to Victim

14    One.

15         So Victim One is, essentially, made whole, which is

16    why Victim One did not come forward with restitution amounts.

17         With regard to Victim Two, there was a point at which

18    the fraud was detected and there was a reversal of some amount

19    of funds that could happen relatively quickly.  That was about

20    $74 million worth of funds.

21         The $26 million amount that's left for restitution

22    purposes is the amount that was outstanding that was a loss for

23    Victim Two.

24         The reason for that was because, even though they

25    could reverse about $74 dollars of wire, that was the most

JB6EEVAC

1    recent wire that was sort of available to them in terms of

2    funds through these international transactions.

3            The $26 million had already been disbursed by the

4    defendant and his coconspirators to a series of other bank

5    accounts in Cyprus, in Latvia, and elsewhere.

6            Once that second transfer happened, you need to go

7    through other means to try to recoup those expenses.  The

8    Government has devoted resources towards civil forfeiture of

9    those funds, including mutual legal assistance treaty requests

10   to other law enforcement to help us with that, but that is an

11   onerous and long-term process, and those monies, for the most

12   part, have not been returned to Victim Two as of yet.

13           THE COURT:  Was any money seized or recovered from

14   this defendant?

15           MS. CHOI:  No, your Honor.  He was arrested when he

16   was returning from Belarus to Lithuania and he did not have

17   funds on him.  He didn't have any cash on him at the time.

18           THE COURT:  Is there any indication that any amount of

19   this restitution is likely to be collected?

20           MS. CHOI:  Your Honor, I would say it's unlikely that

21   a significant portion will be recovered from this particular

22   defendant.  But there are other means by which we're attempting

23   to resolve those outstanding funds, including by working with

24   foreign law enforcement who had in some instances been able to

25   seize some of those funds that will go towards this end.

JB6EEVAC

1    To the extent that we can through civil forfeiture

2  recoup those funds, we'll obviously send them back to Victim

3  Two, and it would decrease Mr. Rimasauskas's outstanding

4  judgment.

5    THE COURT:  And these are funds that have been

6  identified, seized, in corporate bank accounts?

7    MS. CHOI:  Yes, your Honor, and those are all

8  fraudulent bank accounts, all shell companies that don't do

9  anything other than receive funds from these types of fraud

10  schemes.

11    Our understanding is that they were opened by some of

12  Mr. Rimasauskas's coconspirators, some of whom he knew -- and

13  knew well -- and they went and opened these bank accounts

14  because, in part, I think, they understand that once you move

15  the funds from the first identified bank account to several

16  other ones in various countries, it's harder to reverse those

17  transactions.

18    THE COURT:  Does the investigation indicate that there

19  are other individuals who played a similar role as this

20  defendant, or this defendant played a particular role with

21  regard to the transfers?

22    MS. CHOI:  I would say this defendant is uniquely

23  situated in the sense that he opened the main bank accounts in

24  the -- I guess, I don't know how to put this -- the Taiwanese

25  hardware manufacturer's name.

JB6EEVAC

1      He was the one who created those particular bank

2  accounts, the first step.  There are other individuals whose

3  names appear on the other bank accounts that were being used

4  who would then further disburse those funds, but they are not

5  -- we don't have any evidence to suggest the same people were

6  used in both Scheme One and Scheme Two against Victim One and

7  Victim Two the way that this particular defendant was.

8      Meaning, he was there for both of those victims, and I

9  don't believe that we have evidence that suggests that these

10  other sort of second tier money launderers were in the scheme

11  for the same period of time.

12      THE COURT:  And all of the approximately $122 million

13  was supposed to flow through this one bank account?

14      MS. CHOI:  Two bank accounts but, yes, your Honor.

15      THE COURT:  Set up by this defendant?

16      MS. CHOI:  Exactly.

17      THE COURT:  And disbursed to other bank accounts

18  around the --

19      MS. CHOI:  Yes, your Honor.

20      Again, it would have been one thing had the defendant

21  stopped after the first bank account and the first victim.

22  There could be multiple reasons why he did that.  He might not

23  have even known that this was a fraud if had just did that one

24  thing.

25      But the fact that he had been involved in the legal

JB6EEVAC

proceedings in Latvia and that he made false statements, and then continued to proceed with the scheme with regard to Victim Two is that, I think, sets him apart.

He's not a passive player who just used his name to open these bank accounts. He did it once, he did it twice, and created all sorts of fake documents with his signature on them to support this fraud and to make representations to law enforcement -- the courts -- that this was a real company when it was, in fact, nothing but stealing from these victim companies.

THE COURT: After law enforcement, or the court proceedings began, how much money flowed to the bank account?

MS. CHOI: Right. The first victim, it was about $24 million that flowed to the first bank account that was opened in Latvia by the defendant; and then with regard to the second victim in Cyprus, again, a bank account was opened by the defendant. That was the one that was about $98 million.

He saw the full scope of the $24 million. It was bank accounts in his name. We have evidence that he monitored the transactions that were going into and out of the account.

Even if he were not the person directing the flow of the funds, he knew what was going on there, he had control over the account, and that's why they -- he had to play this active role in negotiating with the bank to make sure the funds went through, and he was fighting with the banks when the banks

JB6EEVAC

1    seized the funds and making representations to law enforcement

2    in Latvia -- as well as their courts -- about the nature of

3    this purported, ongoing concern that was not, in fact, a real

4    company.

5              THE COURT:  How much money after that was still --

6              MS. CHOI:  Your Honor, I'm trying to understand what

7    you mean by that.

8              THE COURT:  You say that he continued his activities

9    after he was involved in these court proceedings.

10             MS. CHOI:  Right.  That would be the $96 million, your

11   Honor.

12             THE COURT:  So after he was confronted with this

13   fraudulent scheme --

14             MS. CHOI:  Yes.

15             THE COURT:  -- you say another $96 million flowed or

16   was attempted to flow?

17             MS. CHOI:  Right.  The jig was up with regard to

18   Victim One in Latvia, so the solution for the defendant and his

19   coconspirators was:  Well, like, why don't we try it again.

20   Let's go back to the well and go to Cyprus this time.

21             That required the defendant to fly to Cyprus, present

22   the documents to the Cypriot Bank, open a bank account in

23   Cyprus after all the Latvian proceedings were going down.

24             Then, quite frankly, he was pretty brazen about it

25   because he took the statements from the victim, from the first

JB6EEVAC

1   victim bank in Latvia, which showed the degree and volume of

2   the transactions coming from Victim One in an effort to trick

3   the Cypriot Bank to say:  This is a legitimate business.  Look

4   how much money we got from Victim One.

5           On that basis, they allowed for the opening of that

6   bank account in Cyprus and then the $98 million that came from

7   Victim Two in various wires.

8           So all that happened with Victim Two after he

9   understood what was going on to be a fraud with regard to

10  Victim One, if you see the facts in the most sympathetic light

11  to the defendant.

12          THE COURT:  When you say Victim One, you're talking

13  about the victim the restitution order is --

14          MS. CHOI:  No.  Victim Two is the victim for

15  restitution.

16          So with regard to Victim One, they were, luckily, in

17  Latvia, able to seize almost all the funds and return them

18  after the Latvian court proceedings.

19          With regard to Victim Two, perhaps because they had

20  become a little more sophisticated, they more quickly disbursed

21  the funds after it hit that account that the defendant had

22  opened into various other offshore accounts.

23          Although they were able to reverse $74 million worth,

24  the $26 million -- I'm sorry, the $26 million that is left over

25  is restitution that represents the victim who represents the

JB6EEVAC

1   actual lost funds, which we have not been able to get back for

2   Victim Two as of yet.

3            THE COURT:  Let me hear from Mr. Petrus.

4            MR. PETRUS:  Thank you, your Honor.

5            I only disagree with the Government's recommendation

6   for sentence in this case.  I think the guidelines sentence is

7   wholly inappropriate and my recommendation for the Court is

8   that he receive time served.

9            He has been in for two years and eight months, and as

10   I laid out in my sentencing memorandum in the supplement

11   letter, he also served, as part of that, five months in

12   Lithuania, and there's argument there as to why he should get

13   credit for that.

14            He has no prior record.  He has a long work history.

15   He has been married for 21 years.  He's been married for 21

16   years, and in addition he's not eligible for any programs in

17   the U.S. system.

18            As to some of the Government's points, your Honor, I

19   think what's interesting about it is, is that it's more

20   persuasive what the Government is not saying than what they are

21   saying.

22            For example, Judge, they don't allege that

23   Mr. Rimasauskas created this conspiracy.  They don't allege

24   that he led it.  They don't allege that he organized it.  They

25   don't allege that he was the muscle behind it.  They don't

JB6EEVAC

1    allege that he was the brains behind it.

2            They don't allege that he brought the technical

3    computer knowledge to execute it.  They don't even allege that

4    he translated documents from Lithuanian to English, and they

5    don't allege that he brought the legal expertise that a lawyer

6    would need to draft up these documents, and they admit, of all

7    the money lost, it's about a hundred thousand dollars that he

8    got away with.

9            I think it's important for the Court to continue to

10   sentence him to time served to distinguish him from all the

11   people in the conspiracy who must have existed and did far

12   worse.

13           His role was fungible and easily replaceable; and as

14   near as I can tell, one of the primary reasons why he was

15   picked up and brought into this conspiracy is because he had EU

16   citizenship so he could open up the bank accounts, and he was

17   down on his luck with work and he was drinking heavily.  He has

18   a long history of alcohol abuse, unfortunately.

19           So for all those reasons, I think that he needs a

20   sentence that is very distinguishable from all those other

21   people, and I'd ask the Court to impose time served.

22           Thank you.

23           THE COURT:  I'm just not clear who you're asking me to

24   compare him to because I don't have any information about

25   others involved, what their roles were, what the extent of

JB6EEVAC

1    their activity was.

2              I am not sure, other than because, as they're saying,

3    his being here as the person who has been caught and has taken

4    the fall, I don't understand who else I'm supposed to say is

5    somehow more culpable or played a more significant role than he

6    did, other than the abstract argument that you made that there

7    must be other bad people out there that he was a coconspirator

8    with who did worse things than he did.

9              MR. PETRUS:  Well, your Honor, it's unfortunate there

10   is nobody else that's been brought to justice in this matter,

11   but the Court can clearly infer from what the Government's not

12   saying, and what they are accusing him of doing, that he did

13   not lead it.  They don't allege that he did.

14             THE COURT:  The only thing I'm concerned about is, you

15   wanted me to infer things that he, in fact, has knowledge of

16   and I'm not sure why I should be trying to guess that somehow

17   there are other people that were involved with him that are

18   more culpable when that isn't the representations that are

19   being made by either him or you:  As to who it was, what they

20   did, why he is so much less culpable than they are, why and to

21   what extent his role is somehow in mitigation compared to some

22   other people or some other characters that you are indicating

23   that are involved here.

24             MR. PETRUS:  Your Honor, can we have a sidebar on this

25   brief issue, please?

JB6EEVAC

1              THE COURT:  All right.

2              MR. PETRUS:  Thank you.

3              (Pages 19 through 30 SEALED by order of the Court)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JB6EEVAC

1          (In open court)

2          THE COURT:  How much time did you want, Mr. Petrus?

3          MR. PETRUS:  Given it's the holiday, can I have until

4     January, your Honor?

5          THE COURT:  All right.

6          I'm going to adjourn sentence until January the 9th.

7          MS. CHOI:  Your Honor, one moment.

8          (Discussion off the record)

9          MS. CHOI:  Your Honor, could we have it earlier?   Can

10    we have it in January, if at all possible?

11          The reason for that is, both Ms. Zverovich and I are

12    on separate trials on January 13th, and that's a pretrial

13    conference date for me, I believe.

14          THE COURT:  I can move it up in that week, but I can't

15    move it to the week before that.

16          MS. CHOI:  One moment.

17          THE COURT:  I can move it up to the 7th; otherwise, it

18    will have to be in mid-December.  I can give you the week of

19    December 16th, December 17th, 18th and 19th, or the January 7th

20    date.

21          MS. CHOI:  Your Honor, I think the Government's

22    preference would be any of those December dates.

23          MR. PETRUS:  What was the most recent December date?

24          THE COURT:  The 19th.  Thursday, December 19th?

25          MS. CHOI:  That's fine with the Government.

JB6EEVAC

1          MR. PETRUS:  I can do the 19th as well.

2          THE COURT:  Let's schedule sentence for 10 o'clock on

3     that day.

4          We'll continue at that time.

5          If the parties are going to make any further

6     submissions to me for sentence, try to provide that to me at

7     least 10 days before that.

8          MR. PETRUS:  Yes, Judge.

9          MS. CHOI:  Your Honor, can we have two days after the

10    defendant makes whatever submissions, if any, just so we can

11    rebut, if necessary, things that are said in that submission?

12         THE COURT:  I don't have any problem with that.

13         If I get it by December 9th, Monday, then you can have

14    until Friday the 13th to respond.

15         MS. CHOI:  Thank you, your Honor.

16         MR. PETRUS:  OK.

17         THE COURT:  I'll see all the parties then.

18         MS. CHOI:  Your Honor, I'm sorry.  This is just a

19    minor recordkeeping issue.

20         We already handed up to your Honor the order of

21    restitution.  We also have an order of judicial removal.

22         I think our preference just would be to give it to

23    your Honor and then you can enter them at the time of ultimate

24    sentencing.

25         THE COURT:  Mr. Petrus?

JB6EEVAC

1          MR. PETRUS:  That's fine with defense.

2          (Adjourned)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25